Investment Co. v. Vernon.

·CHARLES B. JAMES' LAND & INVESTMENT Co. *et al. v.*
VERNON *et al.*

(*Jackson.*   April Term, 1914.)

**SPECIFIC PERFORMANCE.   Contract to convey land.   Separate
   tracts.   Partial failure of title.**

Where a vendor contracted to convey separate tracts of land,
and thereafter discovered that because of a failure of title
as to a tract which formed an insignificant portion of the
whole he was unable to perform as agreed, and the tract as
to which the title failed was immaterial to the purchaser's
enjoyment of the rest, the vendor was entitled to enforce
specific performance of the part as to which he was able
to perform, allowing a proportionate rebate in the price for
the deficiency.   (*Post*, 638-650.)

Cases cited and approved:   Foley v. Crow, 37 Md., 51; De Wolf
   v. Pratt, 42 Ill., 198; Coleman's Ex'r v. Meade, 13 Bush (76
   Ky.), 358; Shaw v. Vincent, 64 N. C., 690; Farris v. Hughes,
   80 Va., 930; Creigh's Adm'r v. Boggs, 19 W. Va., 240; Morgan's
   Adm'r v. Brast, 34 W. Va., 332; Van Blarcom v. Hopkins, 63
   N. J. Eq., 466; Keepers v. Yocum, 84 Kan., 554; McCourt v.
   Johns, 33 Ore., 561; Topp v. White, 59 Tenn., 165; Winfrey v.
   Drake, 72 Tenn., 293.

Cases cited and distinguished:   Newman v. Maclin, 6 Tenn., 241;
   Wood v. Mason, 42 Tenn., 251; Cunningham v. Sharp, 30 Tenn.,
   116; Galloway v. Bradshaw, 37 Tenn., 70.

FROM SHELBY.

Appeal from the Chancery Court of Shelby County to the Court of Civil Appeals and by writ of *certiorari* from the Court of Civil Appeals to the Supreme Court. —FRANCIS FENTRESS, Judge.

BARTON & BARTON, for plaintiff.

HIRSH & GOODMAN, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The petition for *certiorari* must be granted, the decree of the court of civil appeals reversed, and that of the chancellor affirmed.

The case is this:

During the year 1908, Vernon sold and conveyed to the complainant two pieces of land in Shelby county, one embracing 139.17 acres, the other 6.82 acres, making 145.99 acres, and both together known as lot No. 3 and the north half of lot No. 2 of Burrow subdivision, and a part of Goodwyn subdivision. The price agreed to be paid, including about $500 worth of personal property on the land, was $15,300. To secure the payment of the purchase money, except $650 paid in cash, a trust deed was executed by the complainant to Samuel Morrow as trustee. This trust deed, by oversight of the parties, omitted to waive the equity of redemption. In course of time the complainant paid, including the original cash payment, $4,500 on the purchase price, but was unable to pay any more. Vernon thereupon set about to foreclose the trust deed by sale of the property, but was embarrassed by the fact that the

equity of redemption had not been waived.  As a result of this fact, Vernon felt the necessity of making some kind of an adjustment with the complainant, to the end that he might secure the complete title, or the title unincumbered by the equity when foreclosure should take place.  The complainant insists that this was not the reason, but other facts existed as the inducing cause, arising out of negotiations between the two.  Whatever the cause may have been, and we deem it immaterial, as it is not denied that the consideration was valuable, an agreement was made between Vernon and complainant that a friendly foreclosure should take place, and the complainant should have the benefit of the $4,500 previously paid in the way of an allowance to him on the purchase price of 127 acres of the land, which was to be reconveyed to complainant after the foreclosure should take place.  Accordingly the following written agreement was executed by the parties:

"This agreement, entered into this 21st day of July, 1910, between J. W. Vernon and Charles B. James, is to the effect that in case said J. W. Vernon shall become the owner, within thirty days from this date, of a certain tract of land known as lot No. 3 of the Burrow tract in the Sixth civil district of Shelby county, Tennessee, containing 124.16 acres, and a small tract estimated at three acres, being immediately east and adjoining the said lot No. 3, bounded on the north and east by Wolf River, and extending south on a line with

the south line of the said lot No. 3, same being the north line of Vernon avenue extended to Wolf River:

"Then in that event the said J. W. Vernon agrees to sell and convey the above-described lands to said Charles B. James for the sum of $8,000 as follows: $500 cash, ten notes for $150 each, payable monthly, beginning thirty days after date, also six notes for $1,000 each, payable twelve, eighteen, twenty-four thirty, thirty-six, and forty-two months after date, and all notes bearing interest from date, and all to be secured by a trust deed upon said lands. And said Charles B. James agrees to buy the above lands at the price and upon the terms stated. Said sale is to be closed on or before the 1st day of September, 1910. This contract is signed in duplicate. Witness our hands this 21st day of July, 1910.

"J. W. VERNON."

"CHARLES B. JAMES."

The foreclosure of the trust deed before referred to was had, and Vernon became the purchaser of the property at the sale, at a price representing about the sum of the balance due on the purchase money notes executed in 1908.

On October 20, 1910, Vernon addressed the following letter to Mr. James:

"Dear Sir: In reference to our contract for the sale of lot 3 of the Burrow tract, with the lights before me now. I have no clear title to the twelve acres claimed by McCallum, Scheibler, King, and others, so I could not sell it. I will, however close up as far as I

can by selling you all of said lot 3 except the twelve acres referred to for $7,700, on terms agreed upon, but this must be closed up by November 1, 1910, all payments dated September 10, 1910, or we will consider the whole trade off, and proceed to make other arrangements. I hope. this will be entirely satisfactory to you, and that you will let me know without delay what I may depend upon.

"Hoping to hear from you soon, I am, as ever,

"Yours, etc., J. W. VERNON."

In order to properly understand this letter, it should be stated that the twelve acres, according to the weight of the evidence, was understood between the parties to be, and was, of the value of $300. It also lay across the river from the other land, and was low and swampy, and not material to the enjoyment of the rest of the land, and the title had failed. The difference between the price stated in the letter of October 20th, and that of the contract of July 21st, is represented by the $300, the value of the twelve acres.

Mr. James declined to accept this offer. After this the parties made numerous efforts to settle, but were unable to accomplish anything. Finally, the present bill was filed on July 8, 1912.

The immediate occasion of the filing of this bill was that the complainant investment company had, in 1908, in addition to the land already referred to, bought another tract of sixteen acres from Vernon at the price of $5,000, for which notes were executed, and also a

trust deed to secure the notes. Vernon caused this land to be advertised for sale, and thereupon the bill was filed, claiming that Vernon was indebted to the investment company in the sum of $4,500, which should go as a credit on the purchase-money notes for the sixteen acres. The basis of the liability claimed was that, inasmuch as Vernon, in the adjustment made prior to the foreclosure of the trust deed on the other lands, had agreed to account to the investment company for the $4,500 already referred to, by way of conveying the land described in the contract of July 21, 1910, and had repudiated that contract, he became liable to pay the aforesaid sum of $4,500 in money, and it was insisted that this should be entered as a credit on the purchase-money notes of the sixteen acres; the interests of C. B. James and the investment company being blended.

The chancellor denied this relief, dissolved the injunction that had previously issued against the sale of the sixteen acres, but further adjudged as follows:

That inasmuch as Vernon had, in his answer and by statement in open court, professed himself as willing and ready to carry out the agreement of July 21, 1910, and the chancellor being of the opinion that under the prayer of general relief he had the power to require the parties to do justice to each other, "that upon the tendering to the said Vernon by the said Charles B. James' Land & Investment Company of the sum of $7,700 and interest, of which $5,000, with interest thereon from September 1, 1910, shall be cash,

the balance shall be evidenced by notes of date September 1, 1910, one due March 1, 1913, for $1,000, one due September 1, 1913, for $1000, one due March 1, 1914, for $700, all bearing interest at the rate of 6 per cent. from date, and secured by a trust deed on the lands agreed to be reconveyed in the document of July 21, 1910, less the twelve acres, the title to which has failed, and also to execute a quitclaim deed to all the lands conveyed in the sale by Vernon to Charles B. James' Land & Investment Company under the sale of June 1, 1908, that the said Vernon is hereby required to reconvey back to the said James' Land & Investment Company the said lands mentioned in the document of July 21, 1910, less the twelve acres, the title to which has failed. Sixty days are given to the James' Land & Investment Company to make said cash payment, and to execute its notes and trust deed as above set forth. In all other respects the complainant's bill is dismissed.''

From this decree the complainants prayed an appeal to the court of civil appeals, and that court reversed the chancellor, and gave the complainants a decree for $4,500 and interest, and also for $300, the value of the twelve acres—in all, $4,800, with interest.

From this latter decree Vernon sought relief by his petition to this court for the writ of *certiorari* to remove the case from the court of civil appeals, to the end that the rights of the parties might be adjudged.

The complainants, however, proceeded on the assumption that it was the duty of Vernon, under the

contract of July 21, 1910, to convey all of the land therein described, regardless of the failure of title to the twelve acres, and that on his failure to make this conveyance there was such a repudiation of the contract as made him liable, either for such a judgment as was entered by the court of civil appeals, or for a credit of the same amount on the notes given for the sixteen acres. It is said in the brief, in effect, that this result is so certain that it scarcely needs argument to support it.

We are unable to perceive the soundness of this proposition. We are of the opinion that, when Vernon found that he was unable to convey the twelve acres, he should have made just such a proposition as he did; that is, to comply with the contract of July 21, 1910, as far as he could, and to offer compensation for the deficiency. We are furthermore of the opinion that by a bill in equity for specific performance he could have compelled the complainants to execute the contract, because the amount he offered to allow by way of reduction in the price was the full value of the twelve acres to which title had failed, and that land was not material to the enjoyment of the rest of the land.

That under such circumstances a vendor can compel specific performance we think is very clear under the authorities bearing on that subject. It is laid down in 36 Cyc. p. 738:

"Where a vendor is unable, from any cause not involving bad faith on his part, to convey each and every parcel of the land contracted to be sold, and it is appar-

ent that the part which cannot be conveyed is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, in such case the vendor may insist on performance with compensation to the purchaser, or a proportionate abatement from the agreed price, if that has not been paid.''

This proposition is fully sustained by the following authorities: *Foley* v. *Crow,* 37 Md., 51; *De Wolf* v. *Pratt,* 42 Ill., 198; *Coleman's Ex'r* v. *Meade,* 13 Bush (76 Ky.), 358; *Shaw* v. *Vincent,* 64 N. C., 690; *Farris* v. *Hughes,* 89 Va., 930, 17 S. E. 518; *Creigh's Adm'r* v. *Boggs,* 19 W. Va., 240; *Morgan's Adm'r* v. *Brast,* 34 W. Va., 332, 12 S. E. 710; *Van Blarcom* v. *Hopkins,* 63 N. J. Eq., 466, 52 Atl. 147; *Keepers* v. *Yocum,* 84 Kan., 554, 114 Pac. 1063, Ann. Cas. 1912A, 748; *McCourt* v. *Johns,* 33 Or., 561, 53 Pac. 601. In *Farris* v. *Hughes,* out of a contract to convey 282 acres, there was a deficiency of seven acres and eighteen poles. In *Morgan's Adm'r* v. *Brast,* out of a sale of 300 acres, there was a failure of title to twenty acres. In *Van Blarcom* v. *Hopkins* it appeared a lot was advertised and sold at judicial sale as being 100 feet front and 255 feet deep, but was only ninety-three feet front and 255 feet deep, including the sidewalk. It appeared that the purchaser was not buying the property for a purpose requiring such an exact area, and he was required to specifically perform the contract, with a deduction for the deficiency. In *Keepers* v. *Yocum* the contract was for 114 acres, and there was a deficiency of two and one-half acres, which it appears was of small importance, and

not material to the purchaser's enjoyment of the rest of the land. It was held that the purchaser could be compelled to specifically perform the contract, with a ratable deduction for the value of the two and one-half acres. Other illustrations are given in the notes to the text of Cyc. above referred to. The acreage in the present case is somewhat larger than in any of these, but the proportion of value is very small—$300 out of a consideration of $8,000.

There are some cases in this State which, on first impression, seem to hold that the vendor must be able and willing to convey all of the land he contracted to sell, but an examination of these cases discloses that the special question we now have before us was not in the mind of the court, or considered in either of them.

In *Newman* v. *Maclin,* 5 Hayw. (6 Tenn.), 241, 242, decided in 1813, it was held broadly that the title to part of the land being doubtful, the vendee could claim rescission. Nothing was said about the proportion or value of the defective acreage. In *Reed* v. *Noe,* 9 Yerg. (17 Tenn.), 283, decided in 1836, it appeared there was a contract to convey seventy and one-half acres, but the complainant's title failed as to twenty-five acres. It was held he was not entitled to specific performance The court said:

"The bill admits that at the time it was filed the complainant did not have a legal title to the entire tract agreed to be conveyed. This being true, he was not in a condition to perform the contract on his part, and, as he could not ask the defendant to take an imperfect

title, he had no ground of equity upon which to come
here for the enforcement of his contract.''

But in this case likewise the court said nothing on
the question of proportion. However, as seen, the land
to which the title failed was more than one-third of the
acreage of the whole tract that was to be conveyed. In
*Wood* v. *Mason,* 2 Cold. (42 Tenn.), 251, it appeared
that the defect of title was as to a one-seventh
undivided interest in the whole. The court held
that a purchaser could not be compelled to
take an undivided interest when he had pur-
chased the whole. It was said that to com-
pel him to execute the contract would make him a
tenant in common against his will with a stranger; that
the owner of the one-seventh of the estate would have
the right to enter upon the land, use and enjoy it, and,
if the owner of the six-sevenths attempted at any time
to prevent his entry, he would be subjected to a suit;
that, if improvements were erected, the land could at
any time be sold for division, and hence the owner of
the six-sevenths be put to great inconvenience and pos-
sible loss. There is a general statement in the opinion
that the purchaser cannot be compelled to accept a part
of the land purchased, with compensation for the fail-
ure to convey the residue; but in view of the special
facts of that case, as just recited, the principle men-
tioned can have no application to the controversy be-
fore us.

We have several other cases which appear to recog-
nize the general doctrine stated in the excerpt from

Cyc., but it is stated in these cases in its negative form arising under bills for recission. *Buchanan* v. *Alwell,* 8 Humph. (27 Tenn.), 516; *Cunningham* v. *Sharp,* 11 Humph. (30 Tenn.), 116, 121; *Galloway* v. *Bradshaw,* 5 Sneed (37 Tenn.), 70; *Topp* v. *White,* 12 Heisk. (59 Tenn.), 165, 181; *Winfrey* v. *Drake,* 4 Lea (72 Tenn.), 293, 295. A short excerpt from two or three of these cases will be sufficient for illustration. In *Buchanan* v. *Alwell* it is said:

"When a contract is for an entire tract of land, and a good title can only be made to part, the purchaser will not be compelled to take title, with an abatement of the price or compensation for the deficiency, especially if the defect of title be so considerable as to defeat the inducement to the purchase, but may disaffirm the contract altogether."

In *Cunningham* v. *Sharp*:

"The general rule is that the purchaser is entitled to the specific property for which he contracted; and if a good title can be made to part only, he will not be compelled to accept a title for such part, with an abatement of the purchase money, or compensation for the deficiency, unless the deficiency be so immaterial as not to affect the inducement to the purchaser."

In *Galloway* v. *Bradshaw*:

"The mere failure of title to a part of the land purchased, which materially affects its value, or constituted an inducement to the trade, gives the vendee the option to set aside and annul the whole contract, or retain the part to which the title is good, and have a de-

duction from the consideration, to the extent of the value of the portion lost, in reference to the whole contract.''

So it appears that our cases are, on the whole, in accord with the current of authority.

We are of the opinion, therefore, that when Vernon made the offer of October 20th he performed his full legal duty, and Mr. James refused it at his peril. Vernon had agreed to refund the $4,500 in the way of a reconveyance of the 127 acres, and in the reduction of the price therefor. When he found that he was unable to convey a small and immaterial part of it, he offered to convey the rest, and make compensation for the deficiency. This was all he could do, and the deficiency was so small the vendee should have accepted it. Not having accepted it, he could not claim the $4,500 in money.

It is true, as insisted by the complainant, that the contract which the chancellor tendered with consent of Vernon in his decree was not the same contract that the parties had agreed upon in the paper of July 21, 1910, since, for one thing, the cash payment was very much larger. But, inasmuch as complainants had lost all right to any relief at all by failure to accept the offer of October 20, 1910, they could not complain that Vernon, through the chancellor's decree, offered them a new contract, which they could either take or refuse.

The result is that the decree of the court of civil appeals should be reversed, and the cause remanded to the chancery court, with leave to complainants to ac-

cept the offer contained in the chancellor's decree within sixty days after the *procedendo* shall be docketed in that court. The chancellor's decree is likewise, in all other respects, affirmed.

The costs of the appellate proceedings will be taxed to the complainants. The costs of the court below will be paid as decreed by the chancellor.